[No. 1513, April 3, 1913.]

EDWIN B. SEWARD, et al., Complainants, v. THE DENVER & RIO GRANDE RAILROAD COMPANY, Defendant.

## SYLLABUS (BY THE COURT).

1. The legislative branch of the government has the right to regulate rates and compel the performance of other duties on the part of the public service corporations, but such rates so established, or required made, must be reasonable, both to the carrier or public service corporation, and to the public.

2.   While the fixing of rates, or the determination of the facilities to be afforded, in the first instance, is a legislative question; the determination of the reasonableness and lawfulness of the rate or other requirement, is a judicial function.

3.   Sections 7 and 8 of article XI of the state constitution construed.

(a)   Held: that said sections provide, for a review by the Supreme Court, of the reasonableness and lawfulness of an order made by the State Corporation Commission, upon the evidence adduced before the Commission; that such sections do not deny due process because on such review additional evidence is not allowed, and because the court must act on the evidence already taken; the court not being bound by the findings of the Commission, and the party affected having the right, on the original hearing to introduce evidence as to all material points.

(b)   Held further, that where the cause is removed to the supreme court by the Commission, upon failure to comply with the order, within the time limited, by the public service corporation, additional evidence can not be introduced.

(c)   Where, however, the cause is removed by one of the parties, and a showing is made that new evidence has been discovered, which the party, by the exercise of reasonable diligence could not have presented at the original hearing, the cause may be remanded to the Commission for the taking of such further evidence.

(d)   Where the cause is removed to the supreme court by one of the parties, within the time limited, the court may, of its own motion, remand the same to the Commission for the taking of further evidence.

(e)   The supreme court, under the constitutional provisions, upon the evidence, determines the reasonableness and lawfulness of the order made by the Commission; if it finds such order to be reasonable and lawful it enforces it; if on the other hand it finds such order to be unreasonable or unlawful, it refuses to enforce the same.

(f)   The direction in section 7 that the supreme court shall "decide such cases on their merits," means that the

court shall decide such cases on a consideration of their substance and the legal right involved in opposition to a decision based upon mere defects of procedure or the technicalities thereof; that the court shall do justice irrespective of informal, technical or dilatory objections.

(g) The court decides, upon the merits, the question of the reasonableness and lawfulness of the order made by the commission, and whether the defendant shall be compelled to comply therewith.

(h) The defendant in such cases, under the constitution, is not entitled to a trial by jury, and a denial of such right does not violate either the federal or state constitution.

(i) The railroad company, by its general appearance before the commission, without objection, waived all irregularities preceding such hearing.

4. While it is proper for the Commission to make findings of fact, such findings have no force or effect in the Supreme Court, as this court is required to pass upon the merits of the case, without indulging in any presumptions, and the court forms its own independent judgment, as to each requirement of the order, upon the evidence.

5. Mandamus does not lie to compel the performance of a duty calling for the exercise of judgment and discretion on the part of the person at whose hands the performance is required; therefore the order made by the Commission should be definite and certain.

6. Under the constitution the Commission is authorized "to require railway companies to maintain adequate depots, stock pens, station buildings, agents and facilities for the accommodation of passengers and for receiving and delivering freight and express," and such as may be reasonable and just. Held: that in determining what are adequate facilities, the court must take into consideration the volume of business, the revenue derived by the railroad therefrom; the number of people to be accommodated; the present facilities and all the facts and circumstances, considering on the one hand the rights of the stockholders of the railroad and on the other the rights of the public.

·7. A railroad company is chartered for the purpose of transporting freight and passengers, and so long·as it continues to exercise its right, under such charter, and does' not elect to surrender up its franchise, the performance of the duty for which it was called into existence and given its· being, may be enforced, even though such performance may entail a pecuniary loss.

8. While it is the absolute duty of a railroad company to transport freight and passengers, it is not its prime duty to provide depots, waiting rooms, station agents, telephone and telegraph facilities.

9. When a railroad company is called upon to perform an absolute duty the question of expense is not to be considered, but when the duty sought to be enforced is only an incident to the main duty, the question of expense is to be taken into consideration in connection with the public necessities.

10. The constitution does not confer upon the Corporation Commission the right to arbitrarily establish a station or to require a station agent regardless of the expense entailed upon the company, or the benefit to be derived by the public.

11. The facilities afforded at any station to the general public, must, in a measure be commensurate with the patronage and receipts from that portion of the public to whom the service is rendered.

12. It is not reasonable to require the installation of telegraph service for the purpose of bulletining trains where the cost of such service is out of proportion to the revenue derived from the portion of the traveling public benefited thereby.

From Corporation Commission.

E. N. CLARK, R. C. LUCAS and RENEHAN & WRIGHT, for Defendant.

Constitutional and statutory provisions governing this case. Sec. 1, art. 11, Constitution of New Mexico; sec. 7, art. 11; chap. 78, laws of 1912; id., secs. 2, 3, 13; sec. 8, art. 11, Constitution; sec. 18, art. 2, Constitution; sec. 1, 14th amendment Constitution of U. S.; sec. 20, art. 2, State Constitution; sec. 12, art. 2, state constitution.

The order of the Commission is not self-executing. Peo. v. Ry., 103 N. Y. 95; Peo. v. Ry., 104 N. Y. 58; Ry. v. Refining Co., 137 Fed. 353; Pate v. Ry., 120 N. C. 877.

This court is not restricted to the ministerial act of enforcing the order of the commission. This court is to decide the case on the merits. Art. XI, sec. 7, State Constitution; Com. v. Ry., 50 Fed. 295; Com. v. Ry., 56 Fed. 925; Com. v. Ry., 134 Fed. 942; 162 U. S. 184; 202 U. S. 613; State v. Ry., 85 Ia. 516.

This court cannot modify the order or make a new one. It can only enforce or decline to enforce it, in its entirety. 33 Cyc. 53; 23 A. & E. Enc. of Law (2nd ed.) 656; Ry. v. State, 101 Pac. 258; State v. Ry., 40 So. 875; Bacon v. Ry., 83 Vt. 421; Siler v. Ry., 213 U. S. 176; Com. v. Ry., 64 Fed. 723; Com. v. Ry., 73 Fed. 409; Com. v. Ry., 134 Fed. 942; 202 U. S. 613; Bridge Co. v. Ry., 37 Fed. 567; Trust Co. v. Ry., 83 Fed. 249; Ry. v. Com., 74 Fed. 805; Ry. v. Com., 47 Fed. 772.

Findings of fact of the Commission are not made evidence and are of no effect. Ry. v. State, 117 Pac. 330; State v. Ry., 47 Kas. 497; Pate v. Ry., 122 N. C. 877; Ry. v. Refining Co., 137 Fed. 343; 208 U. S. 208.

The Commission is an administrative board, with only such limited power as has been conferred upon it. State v. Ry., 49 So. 39; 23 A. & E. Enc. of Law, 394; Peo. v. Ry., 104 N. Y. 58; Ry. v. State, 137 Ala. 439; Ry. v. State, 120 S. W. 1028; Libby v. Ry., 73 Atl. 593; Town v. Ry., 41 Conn. 348; Com. v. Ry., 26 S. C. 353; State v. Ry., 54 So. 394; Board v. Ry., 17 Ore. 65; Com. v. Ry., 216 U. S. 4; Ry. v. Wilcox, 200 N. Y. 423; 23 A. & E. Enc. of Law, (2nd ed.), 653.

Railroads are private property within the protection of constitutional guarantees. State v. Ry., 40 So. 263; Commission v. Ry., 209 U. S. 108; Ry. v. Commission, 206 U. S. 20; Ry. v. State, 120 S. W. 1028.

The power of the Commission is not to be arbitrarily exercised. Ry. v. State, 112 Pac. 1010; State v. Ry., 40 So. 263; State v. Ry., 54 So. 394; State v. Ry., 68 Miss. 653.

An order of the Commission need not be confiscatory in its character and effect in order to be unreasonable and unlawful. Ry. v. State, 101 Pac. 262; Com. v. Ry., 90 Tex. 340; Ry. v. Com., 146 Wis. 146; Ry. v. County, 220 Pa. St. 100.

Provision of the State Constitution prohibiting further reception of evidence is violation of the fourteenth amendment of the Constitution of the United States. Colon v. Lisk, 153 N. Y. 188; sec. 7, art. 11, State Constitution; sec. 1, art. 6, State Constitution; State v. Beswick, 13 R. I. 218; Ry. v. Commission, 78 Fed. 236; Ry. v. Minnesota, 134 U. S. 418; Com. v. Ry., 203 U. S. 335; Cooley on Constitutional Limitations, (7th ed.), 426; Trust Co. v. Smith, 107 Pac. 465; Commission v. Merchant, 103 N. Y. 143; State v. Beach, 147 Ind. 64; Ry. v. Payne, 33 Ark. 816; Howard v. Moot, 64 N. Y. 262; Ziegler v. Ry., 58 Ala. 594; R. R. v. Parks, 32 Ark. 131; Peterslie v. McLachlin, 101 Pac. 1014; Ex. p. Young, 209 U. S. 123; Trust Co. v. Smith, 107 Pac. 465; Roller v. Holly, 176 U. S. 398; In re Lambert, 134 Cal. 626; In re Grout, 93 N. Y. S. 711; McNamara v. McNamara, 86 Neb. 631; Hubbard v. Hubbard, 58 Atl. 969; Yick Wo v. Hopkins, 118 U. S. 356; Ames v. Ry. Co., 64 Fed. 165; McCullough v. Maryland, 4 Wheat. 316; Loan Co. v. Court, 108 Pac. 56; Bennett v. Davis, 90 N. E. 102; Dewell v. Com., 232 Ill. 215; Fisher v. McGirr, 1 Gray 1; Stuart v. Palmer, 74 N. Y. 188; Gilman v. Tucker, 128 N. Y. 190; Coxe v. Lisk, 153 N. Y. 188; Wright v. Hart, 182 N. Y. 330; Conklin v. Cunningham, 7 N. M. 445; Kennon v. Gilmer, 131 U. S. 28; Thompson v. Utah, 170 U. S. 346; Callan v. Wilson, 127 U. S. 550; Webster v. Reid, 11 How. 437; Peo. v. Havird, 2 Ida. 531; Bradford v. Ter., 1 Okla. 366; Ex parte Ortiz, 100 Fed. 955; Atty. Gen. v. Ry. 30, 2 Okla. 108; Chamberlain v. Utah, 1 Utah 267; sec. 17 Organic Act; sec. 2871 C. L. 1897.

Is this a common law action? Art. 6, sec. 2, State Constitution; Com. v. Ry., 56 Fed. 926; 162 U. S. 184; Com.

v. Ry., 134 Fed. 942; 202 U. S. 613; State v. Turnpike Co., 97 Ind. 416.

No petition filed or served upon defendant as required by law. Sec. 2, chap. 78, laws of 1912; State v. Ry., 16 S. D. 517; 94 N. W. 406; 33 Cyc. 50; State v. Ry., 86 Ia. 641; State v. Ry., 90 Ia. 594; In re Ry., 79 Vt. 53.

No sufficient evidence that the Commission endeavored by mediation to effect a settlement of the grievances. Sec. 2, chap. 78, laws of 1912.

Record shows that no certified copy of the order was served on defendant as required by law. Sec. 4, chap. 78, laws of 1912; Morris v. Patchin, 24 N. Y. 394; Ry. v. Cutter, 19 Kas. 83; Wilcox v. Wilson, 178 Mass. 68; Ry. v. Peo., 200 Ill. 237; Nelson v. Blakeley, 54 Ind. 29; Jones on Evidence, (2nd ed.) sec. 523.

Tres Piedras station prior to closing it in 1910. Ry. v. People, 222 Ill. 396; Com. v. Ry., 219 U. S. 433; Ry. v. Carr, 103 N. W. 1087; State v. Ry., 112 Pac. 120; Peo. v. Ry., 103 N Y. 58; Page v. Ry., 129 Ala. 232; Ry. v. Territory, 142 U. S. 492; State v. Ry., 25 So. 126; Ry. v. State, 137 Ala. 439; 2 Elliot R. R. (2nd ed.) sec. 662; Peo. v. Ry., 172 N. Y. 90.

The fact that people from outlying communities purchase their supplies at Tres Piedras, should not have been considered by the Commission. Commissioners v. Ry. Co., 17 Ore. 65; Commission v. Ry., 80 S. W. 1141; Colon v. Liske, 153 N. Y. 188; Commission v. Ry., 103 N. Y. 95; Ry. v. State, 91 Ark. 358; Ry. v. Colburn, 90 Tex. 230; Commission v. Ry., 219 U. S. 433.

The order should not be enforced as to installation of telegraph facilities. Ry. v. State, 91 Wis. 358; State v. Ry., 76 Minn. 469; Ry. v. State, 112 Pac. 1010; Ry. v. State, 103 Pac. 613; Com. v. Ry., 71 Kas. 193; Com. v. Ry., 80 S. W. 1141; Interstate Commerce Com. v. Ry., 215 U. S. 98.

The railroad is not in the commercial telegraph business. Evidence on that point was improper. Ry. v. State, 100 Pac. 15; Ry. v. State, 103 Pac. 617; Ry. v. State, 216 Pac. 196; Ry. v. State, 112 Pac. 980; Line Co. v. Ry. Com., 144 Wis. 523.

The order of the Commission with reference to opening

the station for passengers is unreasonable.   62 Ind. 491;
57 Hun. 110; 77 Pac. 1026; Ry. v. Newell, 106 Pac. 818.

The findings and order of the Commission with refer-
·ence to freight traffic.   Drayton v. Wells, 9 Am. Dec. 719.

The order is confiscatory, unconstitutional and unrea-
sonable.   Ry. v. People, 152 Ill. 230; Ry. v. State, 103
Pac. 617; Ry. v. State, 112 Pac. 1010; Ry. v. Board, 113
Pac. 252; Ry. v. Newell, 105 Pac. 818; Ry. v. Becker, 35
Fed. 883; Board v. Ry., 2 Q. B. Div. 694; Tel. Co. v. Com.,
74 Miss. 80; Wright v. Hart, 182 N. Y. 330; Stone v.
'Trust Co., 116 U. S. 307; St. Louis & San Francisco R.
R. Co. v. Newell, et al., 106 Pac. 818.

FRANK W. CLANCY, Attorney General, for Appellee.

The Commission is more than a mere administrative
body.   Art. 11, State Constitution; Winchester & S. R.
·Co. v. Commonwealth, 55 S. E. 692; L. & N. R. R. Co. v.
Kentucky, 183 U. S. 512.

State Constitution in no way violates or conflicts with
the fourteenth amendment to the Constitution of the U.
·S.    Dreyer v. Ill., 187 U. S. 71.

### STATEMENT OF FACTS.

On the 7th day of May, 1912, certain residents of Tres
Piedras, a small town in Taos County, New Mexico, about
·one-half mile distant from a station on the Denver & Rio
·Grande ·Railroad, bearing the same name, petitioned the
railroad commission to require said railroad company "to
maintain adequate station facilities for the accommodation
·of passengers and for receiving and delivering freight and
·express at its station of Tres Piedras" and further asked
that said railroad company be required to maintain an
agent at said station through whom the patrons of said
railroad "may transact business with such railway com-
pany."

Upon the filing of such petition or complaint the com-
mission had more or less correspondence with the of-
ficials of such railroad company in an endeavor to secure
the facilities requested "by mediation," as required by
section 2 of chapter 78, S. L. 1912, but failing to come to
·an agreement therefor, on July 30, 1912, a ·notice of

Seward v. D. & R. G., 17 N. M. 557.

hearing was served upon the railroad company, together·
with a copy of the order of the commission requiring such
hearing which order was as follows:

"Informal complaint having been presented to this com-
mission by and on behalf of parties residing at and in the·
vicinity of Tres Piedras, a station on the line of railway
operated by the said The Denver & Rio Grande Railroad
Company within the State of New Mexico, to the effect,
that said company had failed to maintain at said station
adequate facilities for the accommodation of passengers
and · for receiving and delivering freight and ex-
press, and that said company was not maintain-
ing an agent at said station, to the great det-
riment of the complainants; the commission hav-
ing made a personal examintion into the matter, and it
appearing to this commission that conditions are such as·
to require a more thorough investigation;

"It is hereby ordered that a hearing on the matter set
out in said complaint be held at the office of the State
Corporation Commission at Santa Fe, N. M., commenc-
ing at the hour of 10 o'clock a. m., on the 30th day of July,
1912, at which time and place the said complainants will
be heard in support of the allegations of their complaint,.
and the said Railway Company will be heard in rebuttal
thereto.

"The parties in interest will be notified accordingly.

"Done at the office of the State Corporation Commission
at Santa Fe, N. M., on the 15th day of July, 1912.

HUGH H. WILLIAMS,
Chairman.

"Attest: GEORGE W. ARMIJO, Clerk."

Upon the date fixed, the cause was heard, upon the evi-
dence of Edwin B. Seward, for the complainants and W.
D. Shea, for the railroad company. From the evidence·
adduced it appears that Tres Piedras was established as a
station on the Denver & Rio Grande Railway in 1880 and
had been continuously maintained until December, 1910.
with waiting room, freight room, and the usual station
accommodations, including an agent, who was also a
telegraph operator, and who, in conjunction with some·

arrangement by the railroad with the Western Union Telegraph Company received and transmitted commercial messages. In December, 1910, the railroad company withdrew the agent from said station, and thereafter maintained no facilities for passengers at said place, but did stop its trains there and take on and let off passengers. Freight was received and delivered at said station, but having no agent, freight charges were required to be paid in advanc upon all incoming freight. When freight reached Tres Piedras it was unloaded by the train crew and placed inside the freight room, the key to which was kept by the wife of the section foreman, who resided in the station, and who, upon application delivered the key to persons receiving freight, who would then unlock the door and select their freight. It appears that no serious loss to any person had occurred by reason of such arrangements, but that it was more or less inconvenient to prepay the charges upon freight ordered, and also to personally superintend the loading of freight when it was shipped out.

Tres Piedras is a small town having one general store run by Mr. Seward, the witness who testified, and a harness shop. It is also headquarters for the Forest Reserve, where all told, 40 people are employed, but many of these employes are not permanently located in the town. Outside the members of the Forest Reserve there are perhaps 25 residents within the town, and within a radius of ten miles there are probably 150 people, not all of whom, however, are served by this station, as Servietta, a station ten miles from Tres Piedras is also within the radius. Mr. Seward says that all told there are forty families who would receive freight at this station, should they have goods shipped in.

For the twelve months ending December 31, 1911, the earnings on passengers and freight, both inbound and outbound, were,

Freight forwarded ................................................$1,075.81
Freight received ....................................... 1,850.66
Passengers ..................................................... 581.23

Total ...............................................................$3,507.70

Of this amount $868.26 was earned during the month

Seward v. D. & R. G., 17 N. M. 557.

of July by the shipment of several carload lots of wool by wool growers. No evidence was introduced tending to show the earnings and operating expenses of the road in New Mexico.

Mr. Seward did not testify that he had ever been a passenger upon the road, but he did testify to inconveniences suffered by people who sought passage, in that there was no shelter at the station in inclement weather, and no means of ascertaining the time of the arrival and departure of trains, except by using the telephone in his store and calling up Servilleta ten miles away. No contention was made, or supported by the evidence, that the installation of a telephone or telegraph service was necessary for the proper operation of the road, in order to secure the safety of employes and passengers, or to facilitate the service. The principal complaint of Mr. Seward in that regard seemed to be that there was no commercial telegraph station maintained at that place.

Upon the evidence taken the commission made the following statement of facts, viz:

"The evidence adduced at the above hearing on behalf of the complainants shows the following:

That station agent and adequate station facilities had been maintained at Tres Piedras for a period of thirty years prior to December, 1910;

That there are some three or four outlying communities in addition to the town of Tres Piedras, which draw their supplies from the town of Tres Piedras;

That Tres Piedras is a distributing point to those outlying communities in the United States mail matters;

That the freight receipts by the Denver & Rio Grande Railroad Company at Tres Piedras for freight received and forwarded amounted to between three and four thousand dollars in the year 1911;

That there are considerable wool shipments from the station of Tres Piedras in the wool season of July each year;

That the station building of the Denver & Rio Grande Railroad Company is kept closed to passengers, and that persons desiring to take a train at Tres Piedras must

wait on the platform in inclement weather for the ar-
rival of trains;

That there is no means of communication from the rail-
road station for purposes of obtaining information as to
the movements of trains or whether or not they are run-
ning on time;

That the freight received at Tres Piedras is unloaded
at owner's risk, and it frequently happens that others than
the consignee gets this freight, on account of no repre-
sentative of the railroad company being present to check
out said freight.

The evidence further shows that Mr. E. B. Seward
pays a major portion of the receipts on account of freight
shipments at this station, he being a general merchant in
the town of Tres Piedras.

The claim of the Denver & Rio Grande Railroad Com-
pany by its Mr. E. N. Clark, in his letter of June 7, 1912,
to the Commission and testimony of their witness, W. D.
Shea, that the business of the station did not justify its
being kept open; that the station was not self-sustaining;
that it would have to be operated at a monthly loss to the
company, if an agent were maintained, is not borne out
by the facts as shown in this cause."

And upon the facts so found the Commission made the
following order:

"This Commission holds railroad interests are not the
only interests to be served at this station, owing to the
fact that this railroad is a public service corporation and
the interests of the public are co-extensive with those of
the defendant company, and the public is entitled to a
reasonable degree of service in return for the patronage
afforded.

In view of these various facts as shown by the record
in this cause—it is hereby ordered by the Commission that
the Denver & Rio Grande Railroad Company open its sta-
tion building at the town of Tres Piedras for the purpose
of affording accommodations to the traveling public who
may desire to take a train at Tres Piedras or alight there-
from, and provide suitable seats, fuel and water for the
comfort of said passengers.

It is further ordered by the Commission that the Den-

ver '& Rio Grande Railroad Company maintain a representative at this station, whose duty it shall be to receive freight and properly store same in freight station to protect same from pillage and the elements, and to properly check out such freight to the rightful owners when called for.

It is further ordered by the Commission that some adequate means of communication be maintained at this station for the purpose of obtaining information as to the running of trains. Whether this be by telephone or telegraph is left to the discretion of the Company.

This order shall be effective on and after the 15th day of September, A. D. 1912.

Done at the office of the State Corporation Commission in the City of Santa Fe, New Mexico, on this 22nd day of August, A. D. 1912."

Defendant neglected to comply with the order, and the Commission removed the cause to this court, in compliance with the provisions of section 7 of article XI of the constitution of New Mexico.

## OPINION OF THE COURT.

ROBERTS, C. J.—Before reviewing the order or the State Corporation Commission, for the purpose of determining the reasonableness and lawfulness of the same, it will be necessary for us to consider and dispose of numerous constitutional questions, raised by defendant, and questions of practice and procedure interposed by both parties. We believe that many of these questions will best be solved by a general resume of the provisions of the constitution under which they arise and a statement of our views in regard thereto, supported by such authorities as we have been able to find, bearing upon the questions involved.

The Corporation Commission of New Mexico was created by section 1 of article XI of the constitution of the state, and section 7 of said article it is provided:

"The Commission shall have power and be charged with the duty of fixing, determining, supervising, regulating and controlling all charges and rates of railway, express, telegraph, telephone, sleeping car, and other trans-

portation and transmission companies and common car-
riers within the state; to require railway companies to
provide and maintain adequate depots, stock pens, station
buildings, agents and facilities for the accommodation of
passengers and for receiving and delivering freight and
express; and to provide and maintain necessary crossings,
culverts and sidings upon and alongside of their road
beds, whenever in the judgment of the commission the
public interest demand, and as may be reasonable and
just. The commission shall also have power and be
charged with the duty to make and enforce reasonable
and just rules requiring the supplying of cars and equip-
ment for the use of shippers and passengers, and to re-
quire all intrastate railways, transportation companies or
common carriers, to provide such reasonable safety ap-
pliances in connection with all equipment, as may be neces-
sary and proper for the safety of its employes and the
public, and as are now or may be required by the federal
laws, rules and regulations governing interstate commerce.
The commission shall have power to change or alter such
rates, to change, alter or amend its orders, rules, regula-
tions, or determinations, and to enforce the same in man-
ner prescribed herein; provided, that in the matter of
fixing rates of telephone and telegraph companies, due con-
sideration shall be given to the earnings, investment and
expenditure as a whole within the state. The commis-
sion shall have power to subpoena witnesses and enforce
their attendance before the commission, through any dis-
trict court or the supreme court of the state, and through
such court punish for contempt; and it shall have power,
upon a hearing, to determine and decide any question
given to it herein, and in case of failure or refusal of
any person, company or corporation to comply with any
order within the time limit therein, unless an order of
removal shall have been taken from such order by the
Company or corporation to the supreme court of this
state, it shall immediately become the duty of the com-
mission to remove such order, with the evidence adduced
upon the hearing, with the documents in the case to the
supreme court of this state. Any company, corporation
or common carrier which does not comply with the order

of the commission within the time limited therefor, may file with the commission a petition to remove such cause to the supreme court, and in the event of such removal by the company, corporation or common carrier, or other party to such hearing, the supreme court may, upon application in its discretion, or of its own motion, require or authorize additional evidence to be taken in such cause; but in the event of removal by the commission, upon failure of the company, corporation or common carrier, no additional evidence shall be allowed. The supreme court for the consideration of such causes arising thereunder, shall be in session at all times, and shall give precedence to such causes. Any party to such hearing before the commission shall have the same right to remove the order entered therein to the supreme court of the state, as given under the provisions hereof to the company or corporation against which such order is directed.

In addition to the other powers vested in the supreme court by this constitution and the laws of the state, the said court shall have the power and it shall be its duty to decide such cases on their merits, and carry into effect its judgments, orders and decrees made in such cases, by fine, forfeiture, mandamus, injunction and contempt or other appropriate proceedings."

Section 8 is as follows:

"The commission shall determine no question, nor issue any order in relation to the matters specified in the preceding section, until after a public hearing held upon ten days' notice to the parties concerned, except in case of default after such notice."

Other sections of the article will not be incorporated in this opinion, as they have no bearing upon the issues involved, but it is perhaps pertinent to add that section 12 makes the provision of the article applicable to all corporations doing business in New Mexico and subject to state supervision.

The provisions of our constitution are peculiar to New Mexico. So far as we have been able to ascertain, no other state, either by statute or constitutional provision, has the same method of procedure. All similar commissions, whether the creatures of statute or constitutional provi-

sions, are designed to control and regulate public service corporations; to secure the safety of employes; the protection of the traveling public, and to compel such corporations to discharge their duty to the public. The matter of such regulation is primarily a legislative function, but experience has demonstrated the inability of the various legislative assemblies to cope with the problem, charged as they are with so many other diversified duties, and their sessions usually of limited duration. While the right of the legislature of a state to regulate rates and compel the performance of other duties on the part of public service corporations has always been recognized by the courts, the rule that such rates, so established, must be reasonable, both to the carrier or public service corporation and to the public is equally well settled. Chicago, etc. Railway Co. v. Minnesota, 134 U. S. 418. While the fixing of the rates, or the determination of the facilities to be afforded, in the first instance, is a legislative question, the determination of the · reasonableness and lawfulness of the rate or other requirement, is a judicial function. This being true, it was early recognized that legislative assemblies could not give to such questions the required time to investigate and determine in advance the reasonableness and justness of the proposed rate, or other requirement, necessitating, as such a question would, long and protracted hearings, and intricate knowledge of such matters. For this reason, we apprehend, the plan was devised, now in vogue in practically all the states, and adopted by the national government, of creating commissions, supposed to be made up of especially trained men; and the delegation to such bodies of administrative and legislative powers. Such bodies are given great latitude and power in investigating all questions, and upon them is conferred the duty of fixing rates and requiring proper facilities for the public accommodation.

The final action of the commission, or rate making body, was, in many instances attended by long and protracted litigation, through various courts, before the reasonableness and lawfulness of the rate was finally established. The public service companies, not infrequently, would render

no assistance whatever to the rate making body, when the matter was under investigation, so that body could arrive at a just rate, and after the rate was established, would go into the courts, and there disclose facts that would clearly demonstrate the unreasonableness of the rate and compel its cancellation and revocation. By this method the almost impossible task of securing justice for the public was clearly discernable. To overcome this difficulty plans were devised, by which the public service corporation was required to present all its evidence before the commission, in advance of the fixing of the rate or other requirement, so that the commission would have the benefit of such knowledge as it might impart and thereby be enabled to arrive at a just conclusion, if possible. From the action of the commission in fixing the rate, or other determination, an appeal or review in the courts was provided, for the determination of the reasonableness and lawfulness of the order made, but, upon the evidence taken in advance before the commission. If the court found the action of the commission unlawful or unreasonable it was set aside. That such procedure does not violate the constitution of the United States, and is authorized, was held by the supreme court of the United States in the recent case of Oregon R. R. & N. Co. v. Fairchild, 224 U. S. 510, where the court had under consideration the Washington statute (session laws 1905, C. 81, as amended March 16, 1907, C. 226). The method provided by the statute of Washington was for a hearing before the commission, upon notice in advance to the company, as to the proposed order which the commission was asked or was proposing to make at which hearing the company had the right to appear by counsel, cross-examine the witnesses produced by the complainants or commission, and to introduce such evidence as it desired. After such investigation the commission made such order as it saw proper, and if the company affected thereby deemed it contrary to law, it applied to the superior court of the proper county for a writ of review, for the purpose of having its reasonableness and lawfulness inquired into and determined. In the superior court, the cause was heard without the intervention of a jury, on the evidence

and exhibits introduced before the commission and certified to by it. Upon such hearing the superior court entered an order, either affirming, or setting aside the order of the commission under review and remanding the cause back to the commission for further action. If such order was affirmed the right of appeal to the supreme court was given.

In the case of Oregon R. R. & N. Co. v. Fairchild, supra, it was contended that the Washington statute failed to furnish an adequate hearing or opportunity for judicial review, especially in prohibiting the submission to the court of competent evidence as to the unreasonableness of the order; and, further, that there was no evidence of a public necessity and that the order was void as taking property without due process of law. Speaking of the objection that the statute failed to furnish an adequate hearing or opportunity for judicial review, the court says:

"So that where the taking is under an administrative regulation the defendant must not be denied the right to show that as a matter of law the order was so arbitrary, unjust or unreasonable as to amount to a deprivation of property in violation of the Fourteenth Amendment. Chicago, etc. R. R. v. Minnesota, 134 U. S. 418; Smyth v. Ames, 169 U. S. 466; Chicago, etc. R. R. v. Tompkins, 176 U. S. 167, 173.

"2. This was recognized by the supreme court of the state, which held that this constitutional right was not denied, but that the statute furnished, first, an adequate opportunity to be heard before the commission, and then provided for a judicial review by authorizing the company to test the validity of the order in the superior court. Both of these rulings are assigned as error by the Oregon Company. It complains that the statute did not afford it the means of making a defense before the commission and yet required it to attack the reasonableness of the order on such evidence as it might have been able to produce before the administrative body. If this were true the defendant's position would be correct, for the hearing which must precede the taking of property is not a mere form. The carrier must have the right to secure and present evidence material to the issue under investiga-

tion. It must be given the opportunity by proof and argument to controvert the claim asserted against it before a tribunal, bound not only to listen but to give legal effect to what has been established. But, as construed by the state court, all these rights were amply secured by the statute, which declared that the commission, "after a full hearing," might require track connection. On such investigation the company could not have objected to the sufficiency of the complaint and obtained an order requiring it to be made more specific as to the exact location of the proposed tracks. The defendant was given the benefit of compulsory process to secure and present evidence in its behalf. There was a provision to require the attendance of witnesses, the production of documents and for the taking of testimony by deposition. It also had the right to cross-examine witnesses produced on the part of the commission and the privilege of offering evidence on every matter material to the investigation.

"3. The defendant insists, however, that, no matter how complete the right to be heard before the commission, the statute having denied all other opportunity for testing the validity of the order in the state courts, furnished an utterly inadequate judicial review because, as the carried could not anticipate what decision would be made, it was unjust to require it to produce evidence, to show in advance, the unreasonableness of an order, the terms of which were not known. From this it argues that the statute was unconstitutional in so far as it prevented the court from receiving competent and non-cumulative testimony tending to prove that there was no public necessity for making the track connection and that the order was void.

This position would be true if the defendant had not been put on notice as to what order was asked for and then given ample opportunity to show that it would be unjust or unreasonable to grant it. In this case, and under the statute, it was given such notice. The complaint alleged that some of the towns were important shipping points and that at all of them there was a public necessity that the roads should be connected. The defendant denied each of these allegations. The hearing, both on the law

and the facts, was necessarily limited to that issue. There could have been no valid order which was broader than that claim. The defendant was charged with notice that if the allegations of the complaint as to necessity were established the order could then be lawfully granted, unless there was also proof that the cost, in comparison with the receipts, or other facts, made it unjust to require the connections to be made. The carrier was therefore given the right both to meet the charge of public necessity and also to establish any fact which would make it unjust to pass the order for which the complainant prayed. The act further provided that after the administrative body had acted, the carrier should have the right to test the lawfulness and reasonableness of the regulation in the Superior Court, where every error in rejecting or excluding evidence, or otherwise, could be corrected. On that trial the court was not bound by the finding of fact, but, like the Commission, it was obliged to weigh and consider the testimony and to give full effect to what was established by the evidence, since it acted judicially, 'under an imperative obligation, with a sense of official responsibility for impartial and right decision, which is imputed to the discharge of official duties.' Kentucky Railroad Tax Cases, 115 U. S. 321, 334.

"4. Having been given full opportunity to be heard on the issues made by the complaint and answer, and as to the reasonableness of the proposed order and having adopted the statutory method of review, this company cannot complain. It has the right to offer all competent testimony before the Commission, which, in view of the form of proceedings authorized by the statute, acted in this respect somewhat like a master in chancery who has been required to take testimony and report his findings of fact and conclusions of law. The court would test its correctness by the evidence submitted to the master. Now would there be any impairment of the right to a judicial review, because additional testimony could not be submitted to the chancellor.

"5.. If, then, the defendant had notice and was given the right to show that the order asked for, if granted,

would be unreasonable, it has not in this case been deprived of the right to a hearing."

The Constitutional Convention of New Mexico, when it adopted article XI of the constitution, and provided **3** for the somewhat novel procedure, after the hearing and determination by the commission for the judicial review of the action of the commission, were attempting to expedite the judicial inquiry into the reasonableness and lawfulness of the order made by the commission; provide a method of procedure that would be inexpensive and simple, and that would preserve the rights of the people on the one hand, and of the owners of the public service corporations on the other.

To this end, notice to the company to be affected by a proposed order, was to be given, and a hearing required thereon, at which the company and the complainant may produce all their evidence bearing upon the issues and the justness of the proposed order; cross-examine witnesses, etc. It was the evident intent of the framers of the instrument, that all the known evidence should be produced before the commission in the first instance. After the commission has made its final order, the public service company had twenty days within which to voluntarily comply with the order. If it does so comply, and the order is satisfactory to the complaining party, no further proceedings are required. Should it fail to comply, unless an order of removal is taken from such determination by the commission, by the company affected, the commission must remove such cause, together with all the evidence adduced upon the hearing, with the documents, etc., to the supreme court. It is also provided that when the case is removed to this court by the commission, "no additional evidence shall be allowed." If the case has been removed here by the defendant the "Supreme Court may, upon application in its discretion, or of its own motion, require or authorize additional evidence to be taken in such cause." We must confess that this provision of the constitution has required a great deal of consideration to enable us to arrive at what we believe to have been the purpose and intent of the framers of the instrument in this regard. It has been suggested that the proper solu-

tion is, that in the event of a failure on the part of the
company affected to remove the cause, it is our duty to
affirm the order of the commission and carry into effect
its determination; that the court, in such event, is not
required to look into the question of the reasonableness
or lawfulness of the order. We do not, however, believe
that such was the intent, but rather that the court should,
in either event, from the evidence adduced, determine such
questions and mete out justice to the company and to
the public. That being true, the only purpose or design,
in giving to the company the right to remove the cause,
was that such party could make a showing to the court
that new evidence had been discovered or new facts de-
veloped which would have a material bearing upon the
matter, and thus give to the court the power to remand
the cause to the commission for the taking of such fur-
ther testimony; or, to give to the court, where the cause
was removed by the company, and it found the evidence
not altogether satisfactory in some respects or upon some
points power to remand the cause and require the taking
of additional testimony. In brief then, the difference
between the two methods, as we understand it, is, that
where the cause is removed by the commission, this court
must determine the lawfulness and reasonableness of the
order upon the evidence adduced, even though it may
appear to the court that other facts might be produced,
which might show the order to be unreasonable. Where
the cause is removed by the company it gives to the court
more latitude, and enables it to require additional testi-
mony before arriving at an ultimate determination of the
question. We believe it was the intention to, in all cases
accord to both parties a judicial hearing, upon the merits.

Upon the hearing in this court it was argued by the
Attorney General that this court had the right to form
its own independent judgment in the matter; that it
was not confined to a consideration of the reasonableness
and lawfulness of the order made by the commission, with
the power to either enforce such order by its judgment,
or refuse to enforce it. That the court could, for instance,
in a rate case, where the commission had fixed the rate
at two cents a mile for carrying passengers, either raise

or lower the rate by its judgment. That such power was·
conferred by the language, "the said court shall have the
power and it shall be its duty to decide such cases on their·
merits, and carry into effect its judgments; orders and
decrees made in such cases, by fine, forfeiture, mandamus,.
etc."

Now if the contention is sound then the provision just·
quoted invests this court with legislative power to fix
rates. There is no doubt but that the people of the state,.
by constitutional provision could confer such power upon
the judges of the Supreme Court. If they saw fit they
might combine all the power of government in one de--
partment, but such action would not be in accord with the·
settled policy of the states of the Union, where it has been
the studied·purpose to, so far as possible, keep separate·
the three great departments, and we should not so con-
strue the provision as. conferring legislative power upon
this body, unless compelled to ·do so· by clear and unmis-
takable language.

Let us consider the· results that would follow such a·
construction. Sec. 152 of article XII of the constitution
of Virginia is in many respects, similar to the provisions
of our constitution, for the regulation of public service·
corporations, but specifically provides, however, for an ap-
peal to the supreme court and that "Whenever the court,
upon appeal, shall reverse an order of the commission af-
fecting the rates, charges or the classification of traffic·
of any transportation or transmission company, it shall at
the same time substitute therefor such order as, in its opin-
ion, the commission should have made at the time of
entering the order appealed from."

This language, it will be observed, is free from doubt, and
specifically confers the claimed powers upon the court.
This provision of the Virginia constitution was before the·
Supreme Court of the United States in the case of Pren-
tiss v. Atlantic Coast Line, 211 U. S. 210, on appeal
from the Circuit Court of the United States, where a bill
in equity was filed to enjoin the enforcement of a rate·
established by the Virginia Commission. The court, speak-
ing through Mr. Justice Holmes held that the power, ex-
ercised by the court, in fixing a rate, under this consti-

tution was legislative and not judicial. He says, "The establishment of a rate is the making of a rule for the future, and therefore is an act legislative, not judicial in kind," and "Proceedings legislative in nature are not proceedings in a court within the meaning of Rev. Stats., sec. 720, no matter what may be the general or dominant character of the body in which they may take place. * * * That question depends not upon the character of the body but upon the nature of the proceedings," and "the decision upon them cannot be *res judicata* when a suit is brought." Now if this be the correct rule, and it appears to be firmly settled in the United States, and certainly appeals to reason, were we to adopt the construction suggested, it would make of this court in these cases, a mere legislative body; its decisions would not be *res judicata,* and parties affected by the orders would be enabled to go into the courts and secure a judicial determination of the reasonableness and lawfulness of the ultimate rate fixed, or facility required to be furnished, by this court. Instead of a speedy determination, untimely delay and expense would be incurred. We do not believe that the case last cited had been called to the attention of the able Attorney General prior to the argument, or the consequences considered in the light of the rule were announced.

What does the language used "decide such cases on their merits" mean? The word decide means to form a definite opinion; to determine; to deliberate. The direction to decide such cases "on their merits" simply means that the court shall decide them on a consideration of their substance and the legal rights involved in opposition to a decision based upon mere defects of procedure or the technicalities thereof. It means the court shall do justice irrespective of informal, technical or dilatory objections or contentions. See cases cited in vol. 5 Words and Phrases, pages 4493 et seq., and also Mulhern v. Railway Co., 2 Wyoming 465 and Seeley v. State, 110 Ohio Rep. 501.

But what is the court to decide on the merits? It is the question of the reasonableness and lawfulness of the order made by the commission, and whether the defendant shall be compelled to comply with such order. It is true

the constitution does not prescribe the question which the court is to decide, but we apprehend no other question could be involved. If the court finds the order reasonable and lawful it enters a judgment to that effect and proceeds to enforce the same. If it finds it unlawful and unreasonable it refuses to enforce it, and in such event the state corporation commission may proceed to form a new order, if necessary or proper, under proper rules to be prescribed by the Commission.

The attorney for the railway company applied to the court for permission to introduce before this court additional evidence, for the claimed purpose of showing that the order entered by the commission was unconstitutional, unreasonable, unjust and confiscatory and in violation of sec. 1 of the XIV amendment to the constitution of the United States, and because, under the provisions of our constitution said company was precluded from introducing said evidence, the argument was made that sec. 7 of article XI was unconstitutional and in violation of said section 1 of article XIV. This contention, however, is answered by the supreme court of the United States in the case of Oregon R. R. & N. Co. v. Fairchild, supra, and need not be further considered. We might add, however, that in no case does the constitution contemplate the taking of additional evidence in the supreme court, but as has been said, in a proper case, the cause will be referred back to the commission for such purpose.

Having considered the provisions of our constitution, involved in this proceeding, we will notice such objections, contained in the motion to dismiss, filed by the railway company, as have not already been disposed of by what has been heretofore said.

The company insists that it is entitled to a jury trial, of the issues involved, because, by section 12 of article 11 of the constitution of this state it is provided that the right of trial by jury, as it heretofore existed shall be secured to all and remain inviolate, and, at the time of the adoption of the constitution, the provision of the Federal Constitution that, "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved," was in force

in the territory. That the provision was in force cannot be disputed. But it is likewise true that the state could abolish trial by jury, if it so elected. In considering the conflicting provisions of a constitution or a statute, the great object to be kept in view is the legislative intent. Viewing the instrument as a whole,' we do not believe there is any conflict. It was evidently the purpose to retain the right to a trial by jury, as it theretofore existed in the territory of New Mexico, except in special proceedings, for which express provision was made in the same instrument. The later express provision carved an exception out of the previous general provision, and of course would be held to control. Were the two provisions, irreconcilably repugnant, the last in order of time and local position would be preferred. Quick v. White Township, 7 Ind. 570.

Objection is made, because of the failure of the commission to serve upon the railway company copies of the petitions or complaints upon which the action was based, but the company is not in position to take advantage of such failure, were it vital, in that no objection was interposed before the commission because of such failure. It will not be conducive to orderly procedure to permit a company, against whom proceedings are instituted, to sit quietly by in the commission and permit the hearing to be closed, and raise objections in this court, which if interposed before the commission could be cured, and delay and expense avoided. Both parties to a proceeding are presumed to be familiar with the files in the case and to know the record. The company, by its general appearance without objection before the commission, waived all irregularity preceding such hearing.

It is next claimed that the record discloses the commission did not, prior to the making of the order for the hearing, endeavor by mediation to effect a settlement of the grievances complained of as required by section 2, chap. 78, S. L. 1912. No objection to such failure was interposed before the commission, and therefore it is not availing here. We might add, however, that the record does show that numerous letters passed between the commission and the company, in an effort to bring about such settlement.

Seward v. D. & R. G., 17 N. M. 557.

It is insisted that the cause should be dismissed, because it appears upon the face of the record herein, that no certified copy of the order of the State Corporation Commission made herein was served on the railway company as required by section 4, chap. 78, S. L. 1912. The record contains the certificate of Edwin F. Coard, assistant clerk of the commission, wherein he certifies "that I served a copy of the within order upon the within named The Denver & Rio Grande Railroad Company by delivering a true copy thereof to," followed by a statement of the person served, etc., which is not questioned. It is true, the proof of service does not specifically show that a certified copy was delivered, but it does recite that a true copy of the same was served. This certainly was sufficient to convey notice to the company of the order and its terms and provisions, and was all the company could ask. This court is enjoined by the constitution, in these matters to disregard technicalities, and this objection is, we think, a trivial technicality, and without merit.

Passing now to the consideration of the question raised by the railway company, upon the merits of the case, we find objections interposed to certain specific findings of fact made by the commission, the assertion being made that such findings are not supported by the evidence. While it is proper for the commission to make findings of fact, still such findings can have no force or effect in this court. Our constitution does not require this court to consider or give any effect to such findings, but enjoins that this court shall "decide such cases on their merits." It does not even, as is usually the case, make the order of the commission prima facie just and reasonable, but on the other hand requires this court to pass upon the merits of the case, without indulging in any presumptions. This being true, it is our duty to take the order made by the commission and test its reasonableness and lawfulness by the evidence adduced upon the hearing. This court forms its own independent judgment, as to each requirement of the order, upon the evidence; therefore the findings made by the commission, may not be justified by the evidence, yet if the evidence sustains the reasonableness and lawfulness of the order made

it would be our duty to uphold and enforce it. It will not therefore be necessary for us to consider the objections interposed to the findings of fact, but we will pass to a consideration of the order made, and ascertain whether it is just, reasonable and correct, and supported by the evidence.

The order made was divided into three separate requirements or provisions, and we will discuss them in their order. The first is as follows:

"It is hereby ordered by the commission that the Denver & Rio Grande Railroad Company open its station building at the town of Tres Piedras for the purpose of affording accommodations to the traveling public who may desire to take a train at Tres Piedras or alight therefrom, and provide suitable seats, fuel and water for the comfort of said passengers."

The evidence discloses that the company has maintained a comfortable station building at Tres Piedras for the past thirty years. That it is ample to accommodate the traveling public in the matter of waiting rooms, etc., but that the company keeps the building closed, and that during inclement weather no shelter is provided; that the section foreman and his wife reside in a portion of the station, and it appears that the railroad company, with but little expense could fulfill these requirements. It is true there is but little passenger traffic originating there, but still, a requirement that the company should maintain a waiting room, and properly heat and light the same is but a humane provision, and we think fully warranted by the facts. Complaint, however, is made as to the form of the order, the company claiming that it is so vague and indefinite, that it does not inform the company as to just what is required. The contention is urged that by the use of the word "accommodations," in the clause "open its station at the town of Tres Piedras for the purpose of affording accommodations to the traveling public," it might mean that the company was to install an agent to sell tickets, check baggage and run a bureau of information. As we read the order, however, we do not so understand the language used, nor do we think that it is obscure or uncertain. It simply directs

the company to open the building "for the accommodation
of the traveling public;" to open it, so that the public
using the road, may have shelter. It does not direct the
furnishing of accommodations, but the opening of the
building, so that the accommodations will exist, viz: a
place to await the train, shelter from the cold or incle-
ment weather.

More trouble exists in the remaining part of the order,
"and provide suitable seats, fuel and water for the com-
fort of the passengers." The order made by the commis-
sion, if found to be reasonable and lawful, is to be en-
forced by this court by "fine, forfeiture, mandamus, in-
junction and contempt or other appropriate proceedings."
Now suppose we found this portion of the order to be in
compliance with the law, and proceeded to enforce it. The
company, claiming a compliance with the order should
show, that it had provided two seats, and had provided a
ton of coal or a load of wood, but no stove; could this
court punish by fine, forfeiture or contempt for a failure
to comply with the order? Who is to determine what num-
ber of seats are sufficient or the kind of seats? Who is
to say whether the seats are suitable? While the order
directs the furnishing of fuel it does not require the wait-
ing room to be heated. The court can only enforce an
order which is reasonably definite and certain. The com-
pany may exercise its best judgment, and yet be met with
a new complaint and be subjected to the burden of an-
other investigation with reference to the same situation.
The public may secure an order for certain accommoda-
tions, which will be absolutely fruitless, because of their
inability to secure its enforcement. This precedent, if
established, would ultimately prove unduly burdensome
upon the court, the commission, the railroads and the peo-
ple. In the interest of justice there should be an end to
litigation. Mandamus does not lie to compel the per-
formance of a duty, calling for the exercise of judg-
ment and discretion on the part of the person at whose
hands the performance is required. Spelling Inj. & Ex.
R., sec. 1384.

As said by the court in the case of Ross v. Butler, 57
Hun. 110:

"The appellant has not been directed to do any par-
ticular thing, and if a commitment were issued upon such
an order, it would be impossible for the sheriff to deter-
mine when the appellant had conformed to its require-
ments. * * * It is absolutely clear that a party can not
be adjudged to be in contempt without definitely stating
what he shall do in order to purge himself of the con-
tempt."

In order to be valid, binding and enforcible the order
must be reasonably definite and certain in its terms and
requirements. Railway Company v. People, 20 Colo. App.
181; 77 Pac. 1026; see also 31 Cyc. 51, where it is said,
"The orders of the railroad commission must be definite
and specific as to what is required to be done by the rail-
road company." State v. Chicago, etc. R. Co., 16 S. D. 517.

We think the order in the present case should have speci-
fied the number and kinds of seats, and instead of requir-
ing the furnishing of fuel, should have required the sta-
tion to be comfortably heated, during certain hours pre-
vious to the arrival of trains.

A more serious question, going to the merits of the or-
der, is presented by the second requirement, viz:

"It is further ordered by the commission that the Den-
ver & Rio Grande Railroad Company maintain a repre-
sentative at this station, whose duty it shall be to receive
freight and properly store the same in freight station to
protect same from pillage and the elements, and to prop-
erly check out such freight to the rightful owners when
called for."

The evidence in the record, and of course we must de-
termine the reasonableness and lawfulness of the order
solely upon such evidence, shows that when this station
was established, and for many years it continued to be
the shipping point for Taos, the county seat of Taos Coun-
ty, and the community surrounding it. While this con-
dition existed the station was very remunerative, and an
agent and the usual station facilities were maintained. A
few years before the railroad decided to discontinue the
agent and telegraph station, a new wagon road was built
from Taos to Servilleta, which was much shorter and
easier of travel. The railroad company then established

a station at the latter point, and by far the major portion
of the traffic that had hitherto found an outlet through
Tres Piedras, went by Servilleta. Business at Tres Piedras
fell off to such a point that the company decided that it
was not warranted in continuing to keep an agent at that
place, and accordingly removed the agent, and since De-
cember, 1910, said station has been operated as a "pre-
pay" station. The railroad has continued to stop its trains
at that place for both freight and passengers. The busi-
ness of the station for the year 1911, as shown by the
evidence amounted to: passenger receipts, $581.23; freight
forwarded, $1,075.81; freight received, $1,850.66 or a
total of $3,507.70. Now it is very evident that the total
should not be credited to this station, because to do so
would be to deprive the stations from which the incom-
ing freight originated, and the outgoing freight was re-
ceived, of their proper credit, and their proper share of
the necessary expense in handling the same. It is not
clear whether the passenger receipts were all derived from
outgoing passengers, therefore we will not consider them
in the division of business, but will presume that they
were properly all credited to this station. Should we di-
vide equally, the incoming and outgoing freight, between
the stations and the stations of its origin or destination,
we find that this station should only be credited with the
sum of $2,044.46, which included the passenger receipts,
for the purpose of arriving at the question—it if be ma-
terial—as to whether the earnings of the station justify
the requirement, for the maintenance of an agent. The
undisputed evidence shows that it will cost the railroad
company $75.00 per month to maintain an agent at this
place, who is not also a telegraph operator, and as the
commission did not require the agent to be an operator,
we will assume that that sum would be sufficient. · This
would require the yearly outlay of $900, to which we add
the sum of $60, shown to be the added incidental expense
in the way of fuel, etc., deducting this sum from the total,
properly creditable to the station, it leaves a balance of
but $1,084.46 for this station to contribute toward the
maintenance and operation of the road, payment of in-
terest, and reasonable dividends. Of course it goes with-

out saying that under the facts shown to exist in this
case, the proportion is not reasonable.

The State Corporation Commission is authorized "to
require railway companies to maintain adequate de-
pots, stock pens, station buildings, agents and facili-
ties for the accommodation of passengers and for re-
ceiving and delivering freight and express," and such
as may be reasonable and just. Now what are adequate
facilities? We apprehend that it would be a very dif-
ficult matter to lay down a rule or general definition that
would be in any wise satisfactory. "Adequate facilities"
for the accommodation of passengers and freight in a city
of 10,000 inhabitants, where a large volume of business
was done, would be one thing, while in a small country sta-
tion, with little business, altogether another. It would
not do to say that the same facilities should be provided
at each station. How then are we to determine what are
adequate? Must we not consider the volume of business,
the revenue derived by the railroad therefrom; the num-
ber of people to be accommodated; the present facilities,
and all the facts and circumstances, considering on the
one hand the rights of the stockholders of the railroad and
on the other the rights of the public? It would not be
fair and just to arbitrarily require a railroad company
to maintain a station and facilities, which the business
did not justify, or the requirements of the people demand.
The supreme court of Oklahoma, in the case of St. Louis
& S. F. R. Co. v. Reynolds, 110 Pac. 668, in considering
what was meant by the term "adequate facilities," says:

"The term 'adequate facilities' is not capable of exact
definition, being a relative term, and calls for such fa-
cilities as may be fairly demanded, regard being had to the
size of such station or place, the extent of the demand of
transportation, its relative location to other places, the
cost of furnishing additional accommodations asked, and
all other facts which would have a bearing upon the
question of convenience and cost." See also Atlantic Coast
Line R. R. Co. v. Wharton, et al., 207 U. S. 328. Of
course it will not be disputed, that where, for some excep-
tional reasons, the conditions are such as to require the
maintenance of an agent, for the proper operation of the

road, or the safety of the traveling public or the accommodation of the patrons of the road residing at or near a station, that the commission has the power to make an order so requiring, regardless of the fact that the maintenance of such service may entail a pecuniary loss upon the railroad.

But in the case now under consideration there is no claim that an agent is necessary for the proper operation of the trains run by the railroad company, or the safety of the traveling public; indeed, by the terms of the order the agent is not required to discharge any duty toward passengers or the train service. He is required only to "receive freight and properly store the same in freight station to protect same from pillage and the elements, and to properly check out such freight to the rightful owners when called for." Now do the facts, as disclosed by the evidence, show that it is necessary to entail an expense upon the company of practically one-half of the freight and passenger receipts, properly credited to this station, for such purpose. Under the present arrangements the train crew unload the incoming freight and store it in the freight room, where it is protected from pillage and the elements, the door being locked and the key left with the wife of the section foreman who lives in the building. There is no evidence showing that any freight has ever been damaged or injured by exposure, or lost by pillage. Indeed, during all the time the present arrangements have been in force, but two incidents have been recited when any inconvenience has resulted; upon one occasion some person, by mistake got a box of salt pork belonging to Mr. Seward, and upon another occasion a box of cheese, but Mr. Seward suffered no loss as the party who received the goods either returned it or paid for it.

No person, who was ever a passenger upon the road, so far as the evidence discloses, has made any complaint as to the character of the accommodations. No freight shipper has complained, with the exception of Mr. Seward, who was the only witness who testified for the complainants. It is true the original grievance or petition was signed by a great many people, but when the time for a

hearing came, and they had the opportunity, in an effective manner to give voice to their supposed grievances, not one of them appeared, except the merchant in Tres Piedras. Now the grievance of one man is not that of the public. The inconvenience of one man is not the inconvenience of the public.

Mr. Seward's principal grievance was, that since the agent was discontinued, the station was what is known as a "prepay station;" that is, freight was required to be prepaid upon all goods ordered by him. Now are the inconveniences of a few shippers, receiving freight upon which the railroad realizes $1,850.00 a year, sufficient to warrant the railroad company in expending $960.00? We do not believe that, under the facts disclosed by the record, the requirement is reasonable. As was well said by the Supreme Court of Louisiana in the case of Morgan's L. A. & T. R. S. S. Co. v. Railroad Commission, 109 La., at page 262:

"In consideration of the matters of comfort and convenience the number of persons who may be concerned or interested in some particular matter at some particular point enter as important factors in determining what is proper to be done."

It might be that the railroad company could make some arrangement whereby it could maintain a representative at this place, who would do all that the order required done, at a much less cost than $960 a year, but the commission has failed to develop any evidence to show such fact, and we cannot go outside of the record.

The Attorney General contends, however, that upon the facts disclosed by the record in this case, the court, in determining the reasonableness or unreasonableness of the order made requiring the maintenance of an agent, must necessarily presume that the order is reasonable and just because the railroad company has failed to introduce evidence showing the receipts from the operation of its lines in New Mexico, and the expense and the just proportion of the fixed charges, etc., upon the road; that having failed to make such showing, the court must presume that its net profits upon its lines in New Mexico are sufficient to justify it in incurring the increased expense at the sta-

tion in question. He evidently reasons upon the theory upheld by the Supreme Court of the United States in the case of Atlantic Coast Line v. North Carolina Corporation Commission, 206 U. S. p. 1, wherein the court says:

"As the duty to furnish necessary facilities in coterminous with the powers of the corporation, the obligation to discharge that duty must be considered in connection with the nature and productiveness of the corporate business as a whole, the character the services required, and the public need for its performance."

In that case the court was considering an order made by the Corporation Commission of North Carolina, which was sustained by the Supreme Court of the state, requiring the railroad company to install an additional passenger train, in order that the passengers on its lines could make connection with another road. The supreme court of the United States, in the case under consideration, differentiates between an order fixing rates and an order requiring the furnishing of a facility, necessarily required, in order that the road may carry out its absolute duty to the public. The court says:

"The distinction between an order relating to such a subject and an order fixing rates, coming within either of the hypotheses which we have stated is apparent. This is so because as the primal duty of a carrier is to furnish adequate facilities to the public, that duty may well be compelled, although by doing so, as an incident some pecuniary loss from rendering such service may result. It follows therefore, that the mere incurring of a loss from the performance of such a duty does not in, and of itself necessarily give rise to the conclusion of unreasonableness under the doctrine of Smith v. Ames, or under the concessions made in the two propositions we have stated."

The court sustained the order which required the railway company to run an additional passenger train, even though to do so resulted in a daily loss to the company of $15.00. It is true the facts in the case disclosed that the company was making a large profit by its operation within the state of North Carolina, and it was contended

that the same rule should be applied, as that applied in rate cases. The court used language that might seem to imply that if that rule were applied it would be proper to take into consideration the net income, but as we read the case, the court did not base its decision upon the fact that such net income was shown, but rather upon the theory that it was the absolute duty of the road to provide sufficient passenger and freight trains for the accommodation of the public, and that the duty could be enforced, even though as a result a pecuniary loss was entailed. This is so we think, because it is the primal and absolute duty of the railroad to provide such facilities.

Such is the very purpose of its organization. It is 7 · chartered for the purpose of transporting freight and passengers, and so long as it continues to exercise its rights, under such charter, and does not elect to surrender up its franchise, the performance of the duty for which it was called into existence and given its being, may be enforced, even though such performance may entail a pecuniary loss. So long as it continues to exercise its franchise rights it can not escape the absolute duties thereby imposed.

Its absolute duty is to transport freight and passengers. It is not its prime duty to provide depots, 8 waiting rooms, station agents, telephone and telegraph facilities. These duties are only incidental to the main purpose of its organization. It might discharge its absolute duties without any of these facilities, by merely stopping its trains at designated places and loading and unloading freight and passengers. When it is called 9 upon to perform an absolute duty, of course the question of expense cannot be considered, but when the duty is only an incident to the main duty then the question of expense becomes of more importance, and in determining the question of reasonableness, the revenue derived by the company from the public, for whose accommodation the facility is to be furnished, becomes of importance and must be considered in connection with the public necessity.

This distinction we think was made more manifest in the case of Mo. Pac. Ry. Co. v. Kansas, 216 U. S. 262,

where the court, in sustaining an order of the Kansas Corporation Commission requiring the railroad company to run a separate passenger train, say:

"But where a duty which a corporation is obliged to render is a necessary consequence of the acceptance and continued enjoyment of its corporate rights, those rights not having been surrendered by the corporation, other considerations are in the nature of things paramount, since it cannot be said that an order compelling the performance of such duty at a pecuniary loss is unreasonable. To conclude to the contrary would be but to declare that a corporate charter was purely unilateral, that is, was binding in favor of the corporation as to all rights conferred upon it and was devoid of obligation as to duties imposed, even although such duties were the absolute correlative of the rights conferred. Was the duty which the order here commanded one which the corporation was under the absolute obligation to perform as the result of the acceptance of the charter to operate the road, is then the question to be considered.

"It may not be doubted that the road by virtue of the charter under which the branch was built was obliged to carry passengers and freight and therefore as long as it enjoyed its charter rights was under the inherent obligation to afford a service for the carrying of passengers."

The same distinction is recognized by the same court in the case of Oregon R. R. & N. Co. v. Fairchild, supra, where the court says:

"If the order involves the use of property needed in the discharge of those duties which the carrier is bound to perform, then, upon the proof of necessity, the order will be granted, even though 'the furnishing of such necessary facilities may occasion an incidental pecuniary loss.' But even then the matter of expense is 'an important criteria to be taken into view in determining the reasonableness of the order.' Atlantic Coast Line R. R. v. North Carolina Commission, 206 U. S., 1, 27; Missouri Pacific Ry. v. Kansas, 216 U. S. 262. Where, however, the proceeding is brought to compel a carrier to furnish a facility not included within its absolute duties, the question of expense is of more controlling importance. In determining

the reasonableness of such an order the court must consider all the facts—the places and persons interested, the volume of business to be affected, the saving in time and expense to the shipper as against the cost and loss to the carrier. On a consideration of such and similar facts the question of public necessity and the reasonableness of the order must be determined."

The constitution does not confer upon the corporation commission the right to arbitrarily establish a station or to require a station agent regardless of the expense entailed upon the company, or the benefit to be derived by the public. It is only authorized to make such an order in this regard, as "the public interests demand, and as may be reasonable and just." It is not to consider alone the interests of the public affected by the order, but must determine whether or not, taking into consideration both the interests of the public and the expense entailed upon the railroad company, the order is just and reasonable. Of course where the question involved in this case, of the safety, or expedition in the operation of trains, or the performance of an absolute duty, a different proposition would be involved, but these questions are not involved.

Suppose, for instance, the railroad company had introduced proof as to its earnings in New Mexico, and it was shown that the railroad company was earning a net return of, say, 10 per cent over and above all operating expenses, would that fact, in and of itself, authorize the corporation commission to require the installation of a service at a station not reasonably warranted by the business which the station produced, or required by the public necessities. A little consideration of the question will demonstrate clearly, we think, the following of such argument. Suppose, for instance, that it was a fact that the railroad company in New Mexico was earning 10 per cent net, after making all proper deductions from its receipts; the corporation commission, in view of this large net revenue, and following the theory suggested by the Attorney General, could require the installation of stations, agents and facilities at diverse places along the line of its road where the receipts did not fairly warrant

the service, or the public necessities require, thereby entailing upon the company such an expense that its net earnings were reduced to, suppose, 6 per cent per annum, which we will assume for the purpose of illustration, would be a fair return upon the property, and below which the corporation commission would have no right to reduce its earnings. The maximum passenger fare in New Mexico as fixed by statute, is 6 cents per mile, and suppose for illustration, that the company is charging the maximum amount of fare allowed by law, if the corporation commission is to be permitted, so long as the earnings upon the present rate of fares and charges show a net return above 6 per cent to require facilities at a station not warranted by the business, how would it ever be possible for the people of New Mexico to secure a reduction in fares and charges? To sanction such a policy would be to impose an unjust burden upon the patrons of larger stations, whose receipts will be required to help make up the deficit caused by the smaller stations. As said by the supreme court of Oklahoma in the case of C. R. I. & P. R. R. Co. v. State, et al., 103 Pac. 617:

"Where the receipts of such stations will not justify the installation of such service, there being eliminated the question of the safety or expedition in the operation of trains, it would be unreasonable to require such service to be installed, creating a deficit at such station to be borne by the receipts at a larger station, except in exceptional instances. The patrons of a large station, after the expenditures, for the reasonable maintenance of the station, and the proper contribution towards maintenance, equipment and operation of the line, and the paying of a reasonable dividend on the investment, are entitled, if it be reasonable and practical to a reduction in rates; and except as stated it is unreasonable and unjust to require large stations to pay deficits at small stations."

And the same court in the case of St. Louis & S. F. R. Co. v. Newell, 106 Pac. 818, says:

"But the facilities afforded at any station to the general public, must in a measure be commensurate with the patronage and receipts from that portion of the public to whom the service is rendered. Otherwise, not only

would an injustice be done the railroad company which would be required to furnish the service at a financial loss, but the other portions of the general patronizing public would be required to pay an additional charge for the service rendered to them over and above that necessary to pay the expense of such service and the reasonable dividend on the investment of the railway company, in order to make up the deficit for the additional service required at such places."

Applying the facts to the principles above enunciated, it does not appear that the order made requiring the maintenance of an agent at this station at the annual charge shown, is reasonable and just, and as the duty is imposed upon the court to determine the reasonableness and justness of the order upon the evidence in the record, we must decline to enforce the order.

The third provision of the order was as follows:

"It is further ordered by the commission that some adequate means of communication be maintained at this station for the purpose of obtaining information as to the running of trains; whether this be by telephone or telegraph is left to the discretion of the company."

The evidence discloses that there are but two trains a day operated upon this road, one going north and the other south. The train going north is usually on time, while the one running south is frequently late. But the passenger receipts from this station, as disclosed by the record, are but $581.23 a year. To maintain an agent who is a telegraph operator would require an additional charge of $20.00 a month, or an annual charge of $240.00, almost 50 per cent of the receipts from this portion of the traffic. If it be contended that it is optional with the company to install telephone facilities, the answer is that there is no proof in the record showing the cost of installing this service. The court cannot speculate as to the probable cost, but it is the duty of the commission to present evidence as to all such facts so that the court will be enabled to determine therefrom the reasonableness and justness of the order. If it be true that the telephone service could be installed for a reasonable amount, then an order so requiring would probably be just and proper.

Certainly it would not be reasonable to require the installation of telegraph service for the purpose of bulletining trains where the cost of such service would be out of proportion to the revenue derived from that portion of the traveling public to be benefited thereby. The position of the court is fully supported by the adjudicated cases upon the proposition. See St. Louis & S. F. R. R. Co. v. Newell, supra; C. R. I. & P. R. R. Co. v. State, supra.

For the reasons stated, the court must refuse to enforce the order made by the commission, and the cause is remanded to the corporation commission for further proceedings should it so elect, in accordance with this opinion.

### SYLLABUS (BY THE COURT).

